1

1         UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF VIRGINIA
2              ALEXANDRIA DIVISION

3   BUBBLES, INC.,                ) Case 1:13-cv-00260
                                  )
4              Plaintiff,         )
                                  )
5        v.                       ) Alexandria, Virginia
                                  ) February 21, 2014
6   SIBU, LLC,                    ) 12:14 p.m.
                                  )
7              Defendant.         )
                                  ) Pages 1 - 25
8

9           TRANSCRIPT OF PLAINTIFF'S MOTION TO

10        ENFORCE JUDGMENT/SETTLEMENT AGREEMENT

11       BEFORE THE HONORABLE ANTHONY J. TRENGA

12          UNITED STATES DISTRICT COURT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

Rhonda F. Montgomery   OCR-USDC/EDVA   (703) 299-4599

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:

 3        JONATHAN D. FRIEDEN, ESQUIRE
          LEIGH M. WINSTEAD, ESQUIRE
 4        ODIN, FELDMAN & PITTLEMAN, PC
          1775 Wiehle Avenue, Suite 400
 5        Reston, Virginia  20190
          (703) 218-2100
 6
     FOR THE DEFENDANT:
 7
          JONATHAN A. SCHIFFRIN, ESQUIRE
 8        SCHIFFRIN & LONGO, PC
          8201 Greensboro Drive, Suite 300
 9        McLean, virginia  22102
          (703) 288-4003
10
          BLAKE D. MILLER, ESQUIRE
11        MILLER GUYMON, PC
          165 Regent Street
12        Salt Lake City, Utah  84114
          (801) 363-5600
13
          NICHOLAS T. MORAITES, ESQUIRE
14        ECKERT, SEAMANS, CHERIN & MELLOTT, LLC
          1717 Pennsylvania Avenue, N.W.
15        12th Floor
          Washington, DC 20006
16        (202) 659-6670

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Civil Action 1:13-cv-260,

2 *Bubbles*, *Inc. v. SIBU*, *LLC*.

3          Will counsel please identify themselves for

4 the record.

5          MR. FRIEDEN:  Good afternoon, Your Honor.

6 John Frieden with Odin, Feldman & Pittleman.  I'm here

7 with my colleague Leigh Winstead and with Lauren

8 Mooney, who is the associate general counsel for the

9 Ratner Companies.

10          THE COURT:  All right.

11          MR. MILLER:  Your Honor, I am Blake Miller

12 from Miller Guymon.  With me is Bruce McMullin from

13 SIBU, John Schiffrin, as well as Nicholas Moraites.

14          THE COURT:  All right.  We're here on a

15 motion to enforce a settlement.  Let me hear from

16 Mr. Schiffrin.

17          Mr. Schiffrin, would you come to the podium.

18          MR. SCHIFFRIN:  Yes, Your Honor.  Good

19 morning.

20          THE COURT:  Good morning.

21          Tell me what your position is as far as

22 whether you had authority to agree to the -- first of

23 all, tell the Court that the case had been settled and,

24 secondly, to tell the other side that the matter had

25 been settled on the basis of the terms that had been

1   provided to you.

2          MR. SCHIFFRIN:   The terms that were provided

3   on the 8th?

4          THE COURT:   On the 8th, yes.

5          MR. SCHIFFRIN:   My understanding of what was

6   provided on the 8th was a consent motion and then was

7   told soon after that the Court would not actually

8   accept a consent motion.   I said that the terms were

9   generally fine.   I maintain that that is the case.

10          THE COURT:   On January 8 at 1:10, there was a

11   note from Mr. Frieden saying that once you guys confirm

12   that the terms I just sent over are the acceptable

13   settlement terms, I think we should be good.

14          Then an hour later you said -- actually, a

15   half an hour later you said, I can confirm that the

16   terms are acceptable.

17          MR. SCHIFFRIN:   Right.

18          THE COURT:   So were you authorized to say

19   that?

20          MR. SCHIFFRIN:   Yes.   Prior to that time, we

21   had discussed that there would still be some wording

22   that needed to be worked out.

23          THE COURT:   So the only issue then is not

24   whether there was a settlement, but what the terms of

25   the settlement were --

1              MR. SCHIFFRIN:  Exactly.

2              THE COURT:  -- and what you found acceptable

3  and what you were accepting were the terms set forth in

4  what was sent over to you at 1:10?

5              MR. SCHIFFRIN:  Right.  But if I may --

6              THE COURT:  Is that correct?

7              MR. SCHIFFRIN:  If I may, Your Honor.

8              THE COURT:  Well, answer my question.  What

9  you found acceptable and what you had authority to

10  accept were the terms that were sent over by

11  Mr. Frieden at 1:10; is that accurate?

12             MR. SCHIFFRIN:  Right.  Generally speaking,

13  yes.

14             THE COURT:  Well, you say generally speaking.

15             MR. SCHIFFRIN:  Well, the general terms that

16  we had agreed on, yes, but we also had three separate

17  terms and conditions that were being bounced back and

18  forth.  I indicated to Mr. Frieden that we would

19  also --

20             THE COURT:  Hold on a minute.  I'm not sure I

21  have a copy of precisely what was sent over at 1:10.

22  Do you have that?

23             MR. SCHIFFRIN:  Mr. Frieden may end up having

24  that.

25             THE COURT:  All right.  I'd like to see that

1   before we proceed.

2           MR. FRIEDEN:  Your Honor, does the Court wish

3   to see the terms that are in the consent --

4           THE COURT:  What I want to see is what you

5   said you had just sent over in your January 8 e-mail at

6   1:10.  You say, I think we should be good once you guys

7   confirm that the terms I just sent over are the

8   settlement terms.

9           MR. FRIEDEN:  Yes, Your Honor.  It was

10  actually sent at 12:46 p.m.  I have it here.  It's

11  Exhibit A to my declaration.

12          THE COURT:  Because that's what Mr. Schiffrin

13  has confirmed he accepted and he had authority to

14  accept.

15          Have you shown a copy of this to

16  Mr. Schiffrin?

17          MR. SCHIFFRIN:  I've seen it, Your Honor.

18          THE COURT:  All right.  Just for the record,

19  what I've been handed is Exhibit A.

20          This is Exhibit A to what, Mr. Frieden?

21          MR. FRIEDEN:  Your Honor, it's Exhibit A to

22  the declaration which was filed along with the brief in

23  support of the motion.

24          THE COURT:  Your declaration?

25          MR. FRIEDEN:  Yes, Your Honor.

1          THE COURT:  All right.  It consists of a

2  January 8 e-mail at 12:46, and attached to that is

3  what's titled Consent Motion To Remove Or Continue

4  Trial Date So That The Parties May Reduce Their

5  Settlement Agreement To Writing.

6          All right.  And just so I'm clear,

7  Mr. Schiffrin, we're in agreement that that's what you

8  received on January 8 and the terms in that is what you

9  confirmed you were accepting by way of your January 8

10  e-mail at 1:48.  Is that correct?

11          MR. SCHIFFRIN:  Yeah, I did receive those.

12          THE COURT:  All right.  Now, why don't we

13  have an enforceable settlement?

14          MR. SCHIFFRIN:  Well, the reason why we don't

15  have an enforceable settlement is I didn't actually see

16  the final terms of the agreement until after I appeared

17  before the Court.

18          THE COURT:  When you say the final terms of

19  the agreement --

20          MR. SCHIFFRIN:  The actual terms of the

21  agreement that would have to be sent to the client.

22          THE COURT:  Hold on a minute.  You're

23  confusing me.

24          MR. SCHIFFRIN:  Okay.

25          THE COURT:  What are you referring to other

 1  than the terms that are in this consent motion?

 2           MR. SCHIFFRIN:  I believe -- and I'd have to

 3  look at it again -- that the terms -- well, I can't

 4  speak to whether the terms in the consent motion are

 5  identical to what we have in the final agreement.  I

 6  know that I had asked for --

 7           THE COURT:  Forget about the final agreement.

 8           MR. SCHIFFRIN:  Well, I think the final

 9  agreement is --

10           THE COURT:  Hold on.  Forget about the final

11  agreement.  But as far as you're concerned, the

12  settlement that you agreed to on behalf of your client

13  is set forth in the consent motion that you received,

14  correct?

15           MR. SCHIFFRIN:  To the best of my knowledge,

16  yes.

17           THE COURT:  All right.  So to the extent

18  there is a dispute about whether your client or the

19  other side has performed under the settlement

20  agreement --

21           MR. SCHIFFRIN:  Right.

22           THE COURT:  -- it's going to be based on the

23  terms set forth in the consent motion --

24           MR. SCHIFFRIN:  And I would --

25           THE COURT:  Correct?  You agree with that?

1          MR. SCHIFFRIN:  Yeah.  And I would maintain

2   that there are probably some ultimate differences on

3   what my client perceived the terms to be and what we

4   relayed.  There are some issues regarding some

5   definitions that needed to be hammered out,

6   particularly beauty shop, beauty salon.  There are also

7   some issues that we have to determine as to what the

8   actual mark is.

9          At this point, as I stand here before you

10  today, we have two very minor issues that are left and

11  have been left.  We've attempted to work this out.

12  We've continued to do so.  At this point, we are here.

13  We have acted in good faith essentially by providing

14  mockups even though we did not have to do that.

15          THE COURT REPORTER:  I'm sorry?

16          MR. SCHIFFRIN:  I'm sorry.  Mockups, drafts,

17  proofs.

18          -- even though we did not have to do that and

19  then that was subsequently incorporated into the terms

20  that we agreed on on January 8.  However, we didn't

21  hear back with regard to finalizing the agreement until

22  essentially our client would have been in breach.

23          So I know there are some back-and-forth with

24  dates, and I know there's a lot of semantics with

25  regard to what we've agreed to.  Essentially, what

1   we've agreed to are the material terms of the

2   agreement, and I don't think there's any question from

3   both sides that that's the case.

4           THE COURT:  Well, what you agreed to was a

5   settlement based on the terms in the consent motion.

6           MR. SCHIFFRIN:  Right, but we were also --

7           THE COURT:  To the extent there's a dispute,

8   this court or some other court is going to have to

9   decide whether one party is breaching or in compliance

10  with those terms.

11          MR. SCHIFFRIN:  Right.  We were also advised

12  that a consent motion would not be valid in this court.

13  As I told Mr. Frieden, Well, I think we may still have

14  some writing to do.  When I represented --

15          THE COURT:  Wait a minute.  Wait a minute.

16          MR. SCHIFFRIN:  Your Honor.

17          THE COURT:  Say that again.  You thought that

18  a consent motion would not be valid?

19          MR. SCHIFFRIN:  That a consent motion -- and

20  I believe it should be in some of the correspondence

21  that we have.  I was advised by -- well, Mr. Frieden

22  told Mr. Zenger, also who has been involved in this

23  case, that to resolve this matter, we do not need to

24  file any sort of consent motion.  So at that point, it

25  appeared that it was off the table.

```
 1              THE COURT:  All right.  It was clear to you,
 2  wasn't it --
 3              MR. SCHIFFRIN:  The basis --
 4              THE COURT:  Hold on a minute.
 5              -- and I think it's reflected in one of the
 6  e-mails that you were told that although you didn't
 7  have to have your final enforceable agreement
 8  memorialized in a final writing --
 9              MR. SCHIFFRIN:  Right.
10              THE COURT:  -- the case was not going to be
11  continued and the case was going to be tried unless the
12  parties --
13              MR. SCHIFFRIN:  Right.
14              THE COURT:  -- would tell the Court that the
15  case had, in fact, been settled by way of an
16  enforceable settlement.
17              MR. SCHIFFRIN:  Right.
18              THE COURT:  Okay.
19              MR. SCHIFFRIN:  But my understanding was
20  that -- that we had seen several terms --
21              THE COURT:  And the enforceable settlement
22  that you thought you had entered into on the basis of
23  which you represented to the Court that the case had
24  been settled were the terms set forth in the consent
25  motion?
```

1          MR. SCHIFFRIN:  I believe what I just said

2    was that the case had been settled.  I don't want to

3    get into a back-and-forth on that.  I had not seen the

4    finalized agreement until afterwards.  I would have

5    liked to have seen it.

6          THE COURT:  I understand that, but you

7    understood as of the time that you represented to the

8    Court in response to its question that the parties had

9    entered into an enforceable settlement as of that

10   moment?

11         MR. SCHIFFRIN:  Right.

12         THE COURT:  Not contingent on anything else

13   based on the terms and conditions set forth in -- that

14   had been passed to the parties and had been confirmed

15   in what was the consent motion -- draft consent motion

16   that had been forwarded to you?

17         MR. SCHIFFRIN:  Right.

18         THE COURT:  All right.

19         MR. SCHIFFRIN:  My mistake, Your Honor, was

20   instead of -- when Mr. Frieden told me that morning

21   that he had not -- that he had sent me the agreement, I

22   said, That's fine.  My mistake that morning was saying

23   this case is settled and not adding the comma, until I

24   see the final agreement.

25         THE COURT:  Well, if you had said that, we

1  would have tried the case.

2          MR. SCHIFFRIN:  Fair enough.

3          THE COURT:  All right.

4          MR. SCHIFFRIN:  I still believe, Your Honor,

5  that the parties are extremely close.  There's only a

6  couple of provisions that remain.  We have actually

7  submitted a signed agreement, which we did on the

8  deadline.  The plaintiff has never signed or indicated

9  that they've accepted anything at this point.

10          So we are here essentially dealing with a

11  couple of issues that are still in play.  Instead of

12  having negotiations to clean this up, all we've

13  received essentially are threats.

14          THE COURT:  All right.  Mr. Frieden, do you

15  want to add to anything?

16          MR. FRIEDEN:  Very briefly, Your Honor.  I

17  think the Court has it correct.  The terms of

18  settlement are those set forth in the consent motion

19  which were transmitted to opposing counsel on

20  January 8.  There was no need for my client to continue

21  to negotiate a settlement which was already reached;

22  although, they did in good faith in an attempt to avoid

23  bringing this before the Court.

24          We would note, Your Honor, that

25  Mr. Schiffrin, though he indicates today that he had

1  authority to make the statements and to enter into an

2  enforceable settlement agreement, in his declaration

3  upon which the opposition was based, he asserted in

4  that sworn statement that he did not have such an

5  authority and never did.

6          As a result --

7          THE COURT:  Well, he has put on the record

8  now -- and I don't hear anyone sitting at the table

9  with him jumping up and saying what he said is

10  inaccurate in any way.  So he's confirmed at the time

11  he accepted the terms set forth in the consent

12  agreement, he did that with authority.

13          MR. FRIEDEN:  Understood, Your Honor.  I

14  suggest only that it goes to the issue of whether it's

15  appropriate for my client to bear the burden of its

16  attorney's fees.

17          THE COURT:  Well, that's a separate issue.

18          MR. FRIEDEN:  Your Honor, on the basis of all

19  of this -- and if we're going to defer and talk about

20  the attorneys' issues in a minute, I would just ask the

21  Court to find that the terms of the settlement were

22  entered into on January 8 and that the terms are those

23  set forth in the draft consent motion.  I would ask the

24  Court to enter an order requiring the defendant to

25  comply with the terms of that settlement, and then we

1  can go from there.

2            MR. MILLER:  Your Honor, may I be heard?

3            THE COURT:  Yes.  Identify yourself again for

4  the record, please.

5            MR. MILLER:  Blake Miller.  I also represent

6  SIBU in this matter.  I'm out of Utah, Your Honor.

7            THE COURT:  All right.

8            MR. MILLER:  It's uncontested that this draft

9  motion or consent motion or whatever the applicable

10  term is was never sent to the client.  It was never

11  sent to SIBU.

12            THE COURT:  Had you seen it?

13            MR. MILLER:  I had not until after this

14  dispute arose.  There is an attorney in my office by

15  the name of Joel Zenger who had seen it.  There was a

16  divisional responsibility here, Your Honor.  In Utah,

17  we were preparing this case for trial, and we're ready

18  to try it.  There were settlement discussions occurring

19  in Virginia.  We were not involved in that respect.  So

20  I can't give you personal knowledge of that.  However,

21  I can tell you that that draft motion, the exact terms

22  of which were never communicated to SIBU until after

23  this mess developed.

24            When we looked at the language, it created

25  two problems.

1          THE COURT:  Well, language of what?

2          MR. MILLER:  Of the settlement agreement

3 that --

4          THE COURT:  Forget about the settlement

5 agreement.  We're talking about the terms in the

6 consent motion, which as I understand it simply reflect

7 terms that had already previously passed between the

8 parties.

9          MR. MILLER:  I don't believe it quite that

10 way.  There was a little bit different language used,

11 Your Honor, in this motion that created an issue.

12 Well, actually, one issue wasn't even addressed.

13 That's the definition of the stores we were to stay out

14 of, what we call the beauty shops or beauty salons.

15 That wasn't even addressed in the consent motion at

16 all.

17          THE COURT:  Right.  So that's going to get

18 down to whether what stores the defendant decides to

19 market in constitute beauty salons or beauty shops.  I

20 mean, that's a plain old contract interpretation issue.

21          MR. MILLER:  That's fine.  We would prefer a

22 definition that would avoid conflict.

23          THE COURT:  I agree.  It seems to me that

24 these issues are not that significant.  The fact of the

25 matter is the only issue before the Court is whether

1  the parties have entered into a binding settlement --

2  based on what I've heard, it's clear to the Court that

3  it had -- and what the terms are.  It's also clear to

4  the Court based on what I've heard so far that it's the

5  terms in the consent motion.

6        Now, that the parties may have subsequently

7  disagreed on further details or further understandings

8  about what some of those terms mean doesn't change the

9  fact that the parties had entered into an enforceable

10  settlement based on the terms in that draft consent

11  motion, which I think there may have been a tweak here

12  and there.  It's certainly, based on the e-mails that

13  have been provided, just substantially reflected terms

14  that had been passing back and forth for some period of

15  time before January 8.

16        MR. MILLER:  Well, I do think there is an

17  issue, and I do think it's important.

18        THE COURT:  What is the issue then?

19        MR. MILLER:  How paragraph 2.1 relates to

20  multi-word marks.  It doesn't define SIBU marks.  What

21  happens is when you -- look, the agreement that what

22  SIBU, the client, thought it was authorizing -- and it

23  didn't authorize this particular language.  The concept

24  was we're going to apply Sea Buckthorn to the mark and

25  it was going to be -- I'll use the word "tagline"

1  attached to it.  These marks are multi-words.  You have

2  SIBU Beauty.  There's also SIBU 7, SIBU Essentials.

3            THE COURT:  Right.

4            MR. MILLER:  If you use the terminology

5  strictly -- and by the way, at the time I first read

6  it, I didn't even interpret it this way.  This came

7  from the plaintiffs -- then you have to put Sea

8  Buckthorn in the middle of the mark.  So now it becomes

9  SIBU -- not SIBU Beauty, SIBU Sea Buckthorn Beauty.

10           The Sea Buckthorn Company, which is one of

11 our marks, you have to drop the "the" because there can

12 be no alphanumeric character between the SIBU and

13 the --

14           THE COURT:  I'm sorry?

15           MR. MILLER:  Alphanumeric.

16           What we suggest and what we signed and sent

17 over, Judge, is simply defining the SIBU mark as

18 including the product name.

19           THE COURT:  I understand.  I think it's a

20 perfectly reasonable position.  Again, from the way I

21 see this issue, that's beside the point.  If that is an

22 ultimate dispute, the question is whether that's in

23 compliance or not in compliance with the terms of the

24 settlement that the parties reached.  It may be that

25 within that context that proof at a trial, if it were

1  ever to happen, is that the parties never reached a

2  meeting of the minds on that term or that there were

3  other collateral agreements and understandings or the

4  terms were ambiguous or all the other contract issues

5  that come up in breach of contract cases.

6       None of that changes the fact that as of the

7  time that the parties represented to the Court in order

8  to avoid a trial that they had reached an enforceable

9  settlement, they had agreed on certain terms that were

10 set forth in a document.  The only dispute we're

11 talking about here is what those terms mean.

12       MR. MILLER:  Well, I --

13       THE COURT:  It doesn't mean there was not a

14 contract of settlement.  It just means there's a

15 dispute over what the settlement requires of the

16 parties.

17       MR. MILLER:  And that dispute has already

18 arisen.  On January 18, plaintiff said, You're in

19 default.  So I mean, we're already there.  I believe

20 there is -- under Virginia law, as I understand it, the

21 authority issue comes from the client.  And if what

22 we're saying is that SIBU itself authorized this

23 particular language, I don't think that occurred.

24       THE COURT:  That's what Mr. Schiffrin said.

25 He was authorized on behalf of his client to accept

1  these terms.

2          MR. MILLER:  That's not my understanding.

3          THE COURT:  He had actual authority.

4          MR. MILLER:  My understanding is that he was

5  authorized in a general way, but not the specific

6  terms.  SIBU didn't even see the terms for them to give

7  that consent.  There is at no time actual authority

8  granted.  There is no apparent authority.

9          And I think the cases are very clear.  I

10 think the best pronunciation of Virginia law is

11 Virginia Supreme Court, which since a 1926 decision of

12 *Singer Sewing Machine*, has made it clear that the

13 client itself has to make that manifestation of

14 consent.  An attorney can't do it.  An attorney can't

15 stand in court and say, I have that authority.

16         I understand the problems that creates.

17         THE COURT:  All right.  Mr. Schiffrin, come

18 to the podium.

19         MR. SCHIFFRIN:  Yes, sir, Your Honor.

20         THE COURT:  Who authorized you to accept the

21 terms on January 18?

22         MR. SCHIFFRIN:  On January 8, I received an

23 e-mail from the client which indicated --

24         THE COURT:  Who is the client?

25         MR. SCHIFFRIN:  SIBU, Mr. McMullin.

1              THE COURT:  You received an e-mail from

2    Mr. McMullin --

3              MR. SCHIFFRIN:  Right.

4              THE COURT:  -- authorizing you to accept --

5              MR. SCHIFFRIN:  Not the consent motion terms,

6    the terms that were -- well, I had a list of terms

7    essentially that we had parsed through.  I had sent it

8    over, and the word back that I received was I had the

9    green light.

10             THE COURT:  How did --

11             MR. SCHIFFRIN:  I can only interpret it to

12   mean --

13             THE COURT:  What difference, if any, was

14   there between those terms that he authorized you to

15   accept and the terms as set forth in this consent

16   motion?

17             MR. SCHIFFRIN:  Well, to my knowledge, the

18   addition of January 17, that came fairly -- January 17

19   was the date essentially that our client would be in

20   breach for not providing a mockup.  That seemed to

21   be -- that was brand new information.  We had had three

22   discussions.  That may have come in the third iteration

23   of it.  If I missed it, that obviously is on me.

24   Essentially, that's saying to my client that they need

25   to provide a mockup of their new label by January 17

1   even though they wouldn't have to actually provide the

2   label until sometime in the year 2015.

3               THE COURT:  All right.  Anything else?

4               MR. SCHIFFRIN:  Nothing else, Your Honor.

5               THE COURT:  No difference between --

6               MR. SCHIFFRIN:  Oh, I'm sorry.

7               THE COURT:  -- the terms that Mr. McMullin --

8               Is it Mr. --

9               MR. SCHIFFRIN:  McMullin.

10              THE COURT:  -- saw and authorized you to

11  accept and what is in this consent motion?

12              MR. SCHIFFRIN:  To my knowledge, very little.

13  I think that 2.1 -- and you may be correct that it may

14  be more of an interpretation than anything else.  But

15  part of what we've been trying to do essentially is to

16  make sure the interpretation is clear.

17              THE COURT:  You're talking about the final

18  settlement agreement?

19              MR. SCHIFFRIN:  Exactly.

20              THE COURT:  I'm talking about the terms of

21  the consent motion.

22              MR. SCHIFFRIN:  No.  I believe the consent

23  motion -- I generally think it was acceptable.  I don't

24  think there was any issue with it.  When I got the

25  green light, so to speak, I think that was essentially

1  meaning that the negotiations that Mr. Frieden and I

2  have had bore fruit and we had had a meeting of the

3  minds.

4          THE COURT:  All right.

5          MR. SCHIFFRIN:  All right.  Thank you, Your

6  Honor.

7          THE COURT:  Mr. Miller, do you disagree with

8  anything Mr. Schiffrin said?

9          MR. MILLER:  Slightly.

10          THE COURT:  Pardon me?

11          MR. MILLER:  Slightly.  I do not believe SIBU

12  authorized giving up its multi-word marks.

13          THE COURT:  Have you seen the e-mail that he

14  referred to from Mr. McMullin?

15          MR. MILLER:  I have seen a thread of e-mails.

16  I don't have them in front of me, Your Honor, but I

17  don't think it resolved that issue at all.  I can tell

18  you that was not SIBU's intent or authorization.

19          THE COURT:  What wasn't?

20          MR. MILLER:  To give up its multi-word marks,

21  that SIBU has agreed to tie in Sea Buckthorn as a

22  tagline.

23          THE COURT:  Again, you're avoiding the issue.

24  The only issue is whether -- not what was intended, but

25  whether the words of this settlement had been agreed

1  to.

2          MR. MILLER:  I can tell you what I've been

3  told with respect to what SIBU authorized.  I don't

4  have that e-mail thread in front of me right now, Your

5  Honor.  I'm sorry.

6          THE COURT:  All right.

7          MR. MILLER:  But I'm told it was to --

8  whatever this mark is, attached to it -- and it can't

9  have no alphanumeric character between this mark and

10  Sea Buckthorn, and there is a certain size and spacing

11  requirement set forth.  Yes, that was agreed to.  But

12  whether the mark is only the word "SIBU" or "SIBU

13  others" was never authorized to be given up.

14          THE COURT:  All right.  Mr. Schiffrin,

15  anything else you want to say -- I mean Mr. Frieden.

16          MR. FRIEDEN:  Only to point out, Your Honor,

17  I think the undisputed facts are clear that

18  Mr. Schiffrin had actual authority.  And in any event,

19  under Virginia law, apparent authority is the rule.

20          I would point out, Your Honor, that the legal

21  fees and costs expended to date on this issue by my

22  client total $24,885.01.  I have an attorney's fees

23  declaration to that effect with a breakdown of hours by

24  attorney.  On the rest, Your Honor, I would rely on the

25  papers.

```
1              THE COURT:  All right.  I want you to submit

2    that to the Court.

3              Also, Mr. Schiffrin, I want you to submit to

4    the Court the e-mails that you received from

5    Mr. McMullin.

6              MR. SCHIFFRIN:  Yes, sir.

7              THE COURT:  I want those submitted by Monday.

8              All right.  The Court is going to review

9    those.  It will decide how to proceed at that point,

10   including whether the Court is going to need any kind

11   of an evidentiary hearing on this.

12             All right.  Thank you.  Counsel is excused.

13             The Court will stand in recess.

14        -------------------------------------
                     Time:  12:38 p.m.
15

16

17

18

19

20

21
         I certify that the foregoing is a true and
22
      accurate transcription of my stenographic notes.
23

24
                              /s/
25                   Rhonda F. Montgomery, CCR, RPR
```