1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
2                  ALEXANDRIA DIVISION

3   BUBBLES, INC.,                 )  Case 1:13-cv-00260
                                   )
4              Plaintiff,          )
                                   )
5         v.                       )  Alexandria, Virginia
                                   )  January 3, 2014
6   SIBU, LLC,                     )  10:43 a.m.
                                   )
7              Defendant.          )
    _____)  Pages 1 - 56
8

9              TRANSCRIPT OF MOTIONS HEARING

10        BEFORE THE HONORABLE ANTHONY J. TRENGA

11          UNITED STATES DISTRICT COURT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1  <u>APPEARANCES</u>:

2  FOR THE PLAINTIFF:

3        JONATHAN D. FRIEDEN, ESQUIRE
         LEIGH M. WINSTEAD, ESQUIRE
4        ODIN, FELDMAN & PITTLEMAN, PC
         1775 Wiehle Avenue, Suite 400
5        Reston, Virginia  20190
         (703) 218-2100
6
   FOR THE DEFENDANT:
7
         JONATHAN A. SCHIFFRIN, ESQUIRE
8        SCHIFFRIN & LONGO, PC
         8201 Greensboro Drive, Suite 300
9        McLean, virginia  22102
         (703) 288-4003
10
         BLAKE D. MILLER, ESQUIRE, *PRO HAC VICE*
11       MILLER GUYMON, PC
         165 Regent Street
12       Salt Lake City, Utah  84114
         (801) 363-5600
13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE CLERK:  Civil Action 1:13-cv-260,

2  *Bubbles, Inc. v. SIBU, LLC.*

3              Would counsel please identify themselves for

4  the record.

5              MR. FRIEDEN:  Good morning, Your Honor.  John

6  Frieden with Odin, Feldman & Pittleman for Bubbles,

7  Incorporated.  I'm here with Leigh Winstead.

8              MR. SCHIFFRIN:  Good morning, Your Honor.

9  Jonathan Schiffrin on behalf of SIBU, LLC.  I'm here

10 with Blake Miller from Miller Guyman, also representing

11 SIBU, LLC, and Bruce McMullin, president of SIBU, LLC.

12             THE COURT:  All right.  Welcome.

13             We're here on cross-motions for summary

14 judgment which I've reviewed together with the many

15 exhibits.  I'll give counsel an opportunity to

16 highlight what they think needs to be highlighted based

17 on the pleadings.

18             Counsel.

19             MR. FRIEDEN:  Thank you, Your Honor.

20             I will do my best to refrain my comments to

21 those which have not been addressed in the voluminous

22 briefing of these issues.

23             First, Your Honor, SIBU, LLC, concedes the

24 validity and protectability of the --

25             THE COURT:  Let me just give you a general

1  observation that both of you can address.  Obviously,

2  the fact finder, that is the Court in this case, is

3  going to have to make a judgment based on whether

4  there's a likelihood of confusion based on a whole

5  range of considerations that have been summarized as

6  nine, but really, there's many more.

7          Why is that just simply not so fact intensive

8  an inquiry that, based on the facts of this case at

9  least, the Court should make that on a full record as

10  opposed to summary judgment?

11          MR. FRIEDEN:  Your Honor, I think in this

12  case, given that it's a bench trial and given the facts

13  that have been submitted and mostly conceded, this is

14  basically the full record.  The fact is that most of

15  the elements have been conceded, Your Honor.  The

16  differences the parties have have to do with their

17  interpretation of the facts, not the facts themselves.

18          THE COURT:  The Court is going to also have

19  to attach weight to certain facts and certain factors

20  and balance all of that out, correct?

21          MR. FRIEDEN:  Yes, Your Honor.

22          THE COURT:  All right.

23          MR. FRIEDEN:  But the facts themselves are in

24  evidence, and they are largely undisputed.  In a

25  similar case -- it's *Synergistic International v.*

1   *Korman*, Eastern District of Virginia, awarded summary

2   judgment to the plaintiff.   That summary judgment was

3   affirmed by the Fourth Circuit.   Very similar facts,

4   two similar marks, some differences.   In that case, it

5   was five years of coexistent use with zero instances of

6   actual confusion.   There were a number of other

7   similarities with the case.   It's very instructive

8   here.

9           I think ultimately the facts -- and the Court

10  can weigh whatever the facts are on the record of the

11  case.   There's not a situation here where there is

12  going to be weighing of the credibility of the

13  testimony in large part, Judge.   I don't think there's

14  a dispute as to -- or a suggestion that there's bias or

15  a suggestion there's someone being untruthful.   The

16  facts are what the facts are, Your Honor.

17          And to get back to the argument with respect

18  to the elements, most of the elements of the claim, at

19  least with respect to liability on trademark

20  infringement are conceded.   SIBU, LLC, concedes that

21  Bubbles owns the CIBU mark, that that mark is valid and

22  protectable.   They suggest, however, that the

23  protectability or the scope of that protection is

24  limited to the goods that are described in the

25  registration.

1          THE COURT:  Which is the hair care products?

2          MR. FRIEDEN:  Which is the hair care

3    products.  It's generally hair care products.  It's a

4    longer description, Your Honor, but that's a good short

5    way to describe.

6          That argument, Your Honor, is contrary to

7    well-established law that the related goods doctrine

8    made clear that the owner of a trademark with a

9    registration has the exclusive right to use that mark

10   not only with respect to the goods mentioned in

11   registration but all related goods as well.

12         In fact, the defendant in *Synergistic*

13   *International, LLC v. Korman*, 402 F. Supp. 2d 651, out

14   of the Eastern District of Virginia in 2005, made the

15   exact same argument suggesting that the incontestable

16   registration should be limited to the narrow scope of

17   the goods described in the registration.  The district

18   court rejected that argument.

19         That rejection of that defendant's argument

20   was affirmed by the Fourth Circuit at 470 F.3d 162 in

21   2006.  In that case, the Fourth Circuit held that a

22   trademark registration of a suggestive mark, as this is

23   conceded to be, should be broadly construed, and the

24   appropriate reading is not limited to the text of the

25   mark's registered purpose.

1          So the CIBU mark is valid and protectable as

2   conceded by SIBU.  That protectability or the scope of

3   protection is not limited, in accordance with the

4   related goods doctrine, to the scope described in the

5   registration.

6          So we move on then to what is essentially a

7   determination as to how confusingly similar these marks

8   are as used in the marketplace.  We've pointed out the

9   concessions made by SIBU in prior proceedings.  SIBU

10  has conceded that the Court may consider those

11  concessions.

12          What they admitted in those cases are that --

13          THE COURT:  Well, the marks are spelled

14  differently, correct?

15          MR. FRIEDEN:  They differ by a single letter,

16  yes, Your Honor.

17          THE COURT:  They look different in terms of

18  script?

19          MR. FRIEDEN:  It's a slightly different font.

20  Both are lower case fonts, yes.

21          THE COURT:  So the strongest argument you

22  have is that some people pronounce them similarly or

23  the same?

24          MR. FRIEDEN:  Well, it's more than some

25  people, Your Honor.  The parties themselves, when they

1  promote to their consumers or potential consumers,

2  pronounce them identically.

3          THE COURT:  All right.

4          MR. FRIEDEN:  That's really what the Court

5  looks to, Judge.  We've cited the case law that

6  supports the fact that it doesn't matter how somebody

7  in the consumer base may pronounce a mark, but it

8  matters how the mark is promoted.

9          Remember, Judge, that a trademark

10  infringement case in the analysis of likelihood of

11  confusion is largely an attempt by the Court to use

12  concrete evidence on how a market is used in the

13  marketplace, to make a guess or an educated guess as to

14  what consumers perceive.

15          Remember that all the evidence that we talk

16  about, all the elements that we talk about, Your Honor,

17  in terms of strength of mark and all the other factors

18  have to do with what the parties are doing and how

19  they're using the mark.  Very little evidence in

20  trademark cases is brought from the standpoint of

21  consumers and how they perceive it; although, it

22  happens --

23          THE COURT REPORTER:  I'm sorry?

24          MR. FRIEDEN:  I'm sorry.

25          Very little of that evidence, Your Honor,

1   comes from the consumer base.  It's an educated guess

2   on the part of the Court on the basis of how the marks

3   are used, how much they spend in advertising, how they

4   present the marks to the public.

5           The case law is very clear on the fact that

6   the pronunciation the public may assign to a mark is

7   immaterial.  The pronunciation that the mark is

8   promoted is what's important.  And in this instance,

9   there are three SIBU marks.  The second SIBU mark is

10  SIBU pronounced SEE-BOO by every promotional video that

11  we've been able to find, every bit of audio that we've

12  been able to find, by the parties during their

13  depositions.

14          CIBU is pronounced just like SIBU.  The

15  dominant portion of the SIBU marks is all SEE-BOO.  The

16  case law that we've cited in our brief make it very

17  clear that the phonetic identity of two marks is very

18  important in terms of determining the similarity of

19  those two marks as used in the marketplace.  Of course,

20  they've admitted, as they had to, in prior proceedings,

21  Your Honor, that the two marks are confusingly similar

22  if they are used for substantially similar goods,

23  essentially related goods.

24          So the real important issue here is in that

25  fourth factor, which is how the goods are related or

1  whether the goods are similar enough to establish that

2  there's a likelihood of confusion.  In this case, Your

3  Honor, we sell hair care products with a few skin care

4  products.  They sell primarily skin care products;

5  although, they've considered expanding into hair care

6  products.  The fact is, Your Honor, that --

7          THE COURT:  The trademark application is

8  still pending with respect to the skin care products?

9          MR. FRIEDEN:  The second CIBU application is

10 still pending, Your Honor.  The reason it's still

11 pending is because they filed an opposition to it in

12 which they allege that the mark is confusingly similar

13 to their mark if it's used for substantially similar

14 goods.  So we're still held up by the positions they

15 took, which they'd like to reverse for the purposes of

16 this litigation, in the United States Patent and

17 Trademark Office.

18         With respect to the similarity of the goods,

19 Your Honor, it is important to note that it's not

20 required that the products at issue in a trademark

21 infringement claim be directly competitive.  The case

22 law in the Fourth Circuit is very clear on that.  What

23 we have here is we have hair care products and skin

24 care products, which are complimentary.  They're used

25 as part of the same personal beauty regiment or

1  personal care regiment depending on how you describe

2  it.  There's no dispute as to that.

3          The nature of the products are clearly

4  complimentary.  In that case, I think *Synergistic*

5  actually suggests that --

6          THE COURT REPORTER:  I'm sorry?

7          MR. FRIEDEN:  *Synergistic International* is a

8  case that reminds us of the holding that when there are

9  complementary goods, those are closely related.

10         Every agency or court that's addressed the

11  matter of hair care and skin care products, Your Honor,

12  has found that they are closely related.  There's two

13  decisions from district courts that we cited in our

14  last reply and probably a dozen decisions of the

15  Trademark Trial and Appeal Board, which all hold the

16  same thing, that hair care and skin care products are

17  related.

18         The facts that are undisputed or not properly

19  disputed demonstrate that they're marketed together.

20  They're sold by the same companies.  They're used

21  together.  And in this instance, it's not just a

22  theoretical concept or a theoretical relationship.  The

23  actual product lines at issue are related.  My client

24  started out using skin care -- or using hair care and

25  then moved into skin care.

1        THE COURT:  When did they move into skin

2  care?

3        MR. FRIEDEN:  They moved into skin care in

4  2010.

5        THE COURT:  And prior to that, how long did

6  these two marks coexist in the marketplace?

7        MR. FRIEDEN:  Your Honor, we began selling

8  our hair care products under the CIBU mark in 2003.

9  It's my understanding that SIBU branded products were

10 first marketed and sold in 2007.  SIBU or SIBU, LLC,

11 considered expanding into hair care in 2009 because, as

12 they admit, it was a natural evolution for their skin

13 care line to expand into hair care; thus, once again,

14 demonstrating that not only theoretically these types

15 of products are related but --

16       THE COURT:  Is it accurate to say that CIBU

17 first raised these trademark issues at the time that it

18 was moving into the skin care area?

19       MR. FRIEDEN:  To suggest that these issues

20 were first raised by my client's move into skin care?

21       THE COURT:  Yes.

22       MR. FRIEDEN:  I believe that the -- I don't

23 believe that the move to skin care had occurred at that

24 time, Your Honor.  I believe that the first issue with

25 respect to these marks occurred in 2008 or 2009.

1          THE COURT:  In what context?

2          MR. FRIEDEN:  In the context of one of my

3   partners, Your Honor.  I'm not sure that it's in the

4   record, but one of my partners contacted SIBU, LLC,

5   with respect to their SIBU mark indicating an issue

6   with our CIBU mark for which we have the registration,

7   which was a prior registration.

8          THE COURT:  And that began your interaction?

9          MR. FRIEDEN:  Yes, A long journey of -- a

10  polite way to put it is interaction, Your Honor.

11         THE COURT:  All right.

12         MR. FRIEDEN:  So the real issue, then, is are

13  the goods closely related?  In this instance, not only

14  are they in a general sense in terms of the product

15  lines or the types of products are related, but these

16  actual product lines are closely related as well.

17         THE COURT:  You're saying they're related

18  irrespective of the skin care overlap?  That even the

19  hair care is related to the skin care by the

20  defendants?

21         MR. FRIEDEN:  Absolutely, Your Honor.

22         THE COURT:  All right.

23         MR. FRIEDEN:  And the only reason -- our move

24  into skin care, their plan to move into hair care only

25  demonstrates the relationship between the products.

1  Because the people who were using the marks believe

2  that to be a natural evolution of their product line.

3  That's just further proof that the two types of

4  products are related, which is consistent with, once

5  again, every court or agency who has considered the

6  issue.

7           THE COURT:  All right.  Would there be any

8  evidence that the defendants are trying to benefit from

9  the good will or product recognition of your client?

10           MR. FRIEDEN:  There is, Your Honor.  And with

11  respect to the intent element or the intent factor, as

12  considered by the courts in determining likelihood of

13  confusion, we would submit that -- and I think the case

14  law support us on this -- that intent in terms of the

15  defendant or the junior trademark user is most often

16  proved by circumstantial evidence.

17           The case law is clear that the evidence which

18  will support a finding with respect to intent is not

19  just evidence of what they were thinking at the time

20  but also circumstantial evidence relating to what they

21  were thinking at the time or their conduct thereafter.

22           In this instance, Your Honor, their intent in

23  adopting the mark is made clear by the fact that, one,

24  they adopted the SIBU mark after the CIBU mark was

25  registered, two or three years after, Your Honor.

1            THE COURT:  Is there evidence that they were

2     aware of the mark at the time they adopted their own?

3            MR. FRIEDEN:  No direct evidence, Your Honor,

4     except for the registration, which would be

5     constructive notice.

6            THE COURT:  Right.

7            MR. FRIEDEN:  And we would concede, Your

8     Honor, that that alone would not be sufficient to prove

9     bad intent, but those aren't the facts of this case.

10    The undisputed facts of this case also demonstrated

11    that --

12            THE COURT REPORTER:  I'm sorry?

13            MR. FRIEDEN:  The undisputed facts of this

14    case also further demonstrate, in addition to their

15    adopting the SIBU marks after the CIBU mark was

16    registered, that they continue to use the SIBU marks

17    not only after becoming aware of the CIBU mark, but

18    after representing in the United States Patent and

19    Trademark Office and the district court for the

20    District of Utah and in this court, Your Honor, that

21    the two sets of marks are confusingly similar if used

22    on similar products.

23            THE COURT:  I assume this was explored in

24    their 30(b)(6) depositions.  When do they state that

25    they first became aware of the CIBU mark?

1            MR. FRIEDEN:  It changed in the course of

2  discovery, Your Honor.  I believe that they -- their

3  latest position is they became aware after being

4  contacted by my partner in 2008 or 2009.

5            THE COURT:  After they had gotten their own

6  registration?

7            MR. FRIEDEN:  And that would have been after

8  they got their own registration, Your Honor.

9            THE COURT:  All right.

10            MR. FRIEDEN:  Moreover, Your Honor, I think

11  their conduct in terms of the obstruction of discovery

12  is instructive in terms of determining their intent.

13  We've string cited Your Honor a number of cases that

14  talk about a court's ability to view a party's conduct

15  in terms of concealing evidence or preventing another

16  party from obtaining discovery is indicative of a bad

17  intent underlying the claim.  I think that the theory

18  of that is that if you have nothing to hide, you don't

19  have to hide it.  So if you believe you've done nothing

20  wrong, then there's no reason to obstruct discovery or

21  to hide information that may support a claim.  Because

22  if you believe you've done nothing wrong, then the

23  facts as they come to light will only prove that your

24  position is correct.

25            Your Honor, another issue, I think, that's

1  probably a cornerstone of the dispute in this case has

2  to do with the weight of the actual confusion evidence.

3  I would point out, Your Honor, that though we have

4  coexisted for six years, not eight as they suggest, and

5  we have demonstrated four instances of actual confusion

6  in addition to the survey evidence, which they also

7  dispute, that does not prevent summary judgment from

8  being granted in this case.

9          Once again, in *Synergistic International v.*

10 *Korman*, in that case, the district court granted

11 summary judgment despite no evidence of actual

12 confusion over five years of coexistence, and the

13 Fourth Circuit affirmed the decision as to liability in

14 that case.

15         Once again, Your Honor, the *Synergistic*

16 *International* case is particularly instructive because

17 the district court held and the Fourth Circuit affirmed

18 that a likelihood of confusion exists when both marks

19 are composite marks and the dominant word is suggestive

20 in the two marks with a difference in the two marks

21 only in the prefix and where the product involved,

22 though not being identical, belongs to the same general

23 class of merchandise.

24         That is precisely the situation that we have

25 here.  We believe that *Synergistic International*

1  controls the decision in this case and demands that

2  summary judgment be granted in favor of the plaintiff.

3          THE COURT:  How is the Court to weigh the

4  phonetic similarities against the visual

5  dissimilarities, if you will?

6          MR. FRIEDEN:  Your Honor, I think it weighs

7  strongly.  The Court points out that these

8  determinations in terms of trademark infringement are

9  very fact intensive.  In this instance, the weight

10 given -- and I think there's some case law that would

11 suggest that the weight given to a phonetic identity is

12 strong.  Particularly in this case, it's important.

13 Because remember, if you look back to the undisputed

14 facts with respect to how these products are promoted,

15 they are promoted, in large part, online with the use

16 of videos where the mark is pronounced repeatedly

17 throughout the video.

18          In instances where -- another example is if

19 you had a situation where there were marks that were

20 only promoted in print, where the consumers were only

21 seeing the marks, then the phonetic similarity would be

22 less important in that instance.  Here, because they

23 are so heavily promoted through the use of online

24 videos and reviews of those products, not only created

25 by the parties but also by people that use them, the

1  phonetic similarity is very important.  It is, in fact,

2  the dominant aspect of the mark and increases the

3  likelihood of confusion because how the consuming

4  public is presented with promotional materials is

5  primarily verbal or auditory.  Therefore, they are

6  hearing the mark as often, if not more, than they are

7  seeing it.

8          We would suggest, Your Honor, also -- and

9  we've cited to a number of cases for the proposition

10 that differences in terms of whether there's a logo or

11 slight differences in font do not necessarily alter the

12 similarity of marks.  In this instance, even the visual

13 similarity is significant.  They are the dominant

14 portion of all the marks.  In fact, the second SIBU

15 mark and the CIBU mark are nearly identical.  It's four

16 letters with the only difference being whether it's a C

17 or an S.

18         As my six-year-old, who is learning to read,

19 points out to me all the time, C and S sound the same,

20 and everybody knows that they sound the same.  So even

21 the visual differences between the marks are

22 insignificant in terms of --

23         THE COURT:  The script is distinctively

24 different.

25         MR. FRIEDEN:  The script is different, Your

1  Honor, but you'll note that both scripts are lowercase

2  fonts.  In very few situations do you have identical

3  fonts.  That would be a much easier case, I admit.

4        But in this instance, you have a lower case

5  font, a four-letter word spelled identically in

6  situations where both are presented in a Far East

7  motif.  They've suggested that we use a Far East motif

8  in terms of our advertising scheme or we use, I guess,

9  Asian language sounding names for our products, which

10 is true.

11       They promote the fact that their primary

12 ingredient that they promote is sea buckthorn, which

13 comes from the Tibetan Himalayas.  They also use a

14 motif which is very Far Eastern feel.  So in light of

15 all of those things taken together, these marks are

16 very similar and likely to cause confusion in the

17 consumer base.

18       THE COURT:  Now, although not part of their

19 trademark, am I correct that the word "sea buckthorn"

20 typically appears with their label?

21       MR. FRIEDEN:  Yes, Your Honor.

22       THE COURT:  What significance do you think

23 that has?

24       MR. FRIEDEN:  In this instance, Your Honor,

25 we view that it has very little significance.  There

1   are some instances where a tag line, for instance,

2   added to a mark will distinguish two marks that are

3   similar.  But in this instance, it's not a tag line.

4   It references a single ingredient of their product.

5          As a consumer looking at that, what I'm

6   likely or reasonably likely to believe is that the CIBU

7   product line is one set of things whereas the SIBU

8   product line is provided by the same company but

9   includes that sea buckthorn ingredient, which is why

10  it's on the label.

11         In fact, that's what you see in the evidence

12  of actual confusion with respect to the focus group.

13  In that video, the woman thought -- the woman who was

14  confused thought that the SIBU branded products were a

15  line of CIBU branded products, that they originated

16  from the same source and that the spelling of the mark

17  indicated a difference but not a difference in source

18  originator or identifier of the originator of the

19  product.

20         So the sea buckthorn addition to the mark,

21  given the similarities of the advertising and the

22  similarities of the marks -- the similarities and the

23  fact that it's an ingredient in the product and

24  narrowly descriptive doesn't distinguish the two marks.

25         THE COURT:  One other question:  What's the

1  scope of the preclusive effect you think the magistrate

2  judge's ruling has with respect to similarity of

3  facilities?

4          MR. FRIEDEN:  With respect to similarities of

5  facilities, Your Honor, which I believe is the fourth

6  factor, the magistrate judge's order that it's

7  established for the purposes of summary judgment and

8  trial that the parties use similar facilities to

9  conduct their business -- so essentially, it's been

10 established in our favor or in favor or in support --

11         THE COURT:  What does that mean?  The

12 magistrate judge didn't really elaborate what that

13 means.  Does that mean they both use retail outlets,

14 they both use Internet, or does it mean something more

15 than that?

16         MR. FRIEDEN:  It means more than that, Your

17 Honor.  It establishes that factor in our favor.

18         THE COURT:  In terms of how much weight to

19 give to that factor, doesn't the Court have to consider

20 some of the factual detail behind that label?

21         MR. FRIEDEN:  I think, Your Honor, the

22 Court -- the Court can't consider the factual detail

23 behind that label, Your Honor, without essentially

24 eviscerating the label.  That's what SIBU, LLC, would

25 like you to do, but the fact is they had a remedy for

1 the magistrate judge's order, and that was to file

2 objections to that order within 14 days.

3 　　　　　THE COURT:  Let me ask you this:  It didn't

4 say that there's an identity of facilities.  So can the

5 Court consider the facts, as I understand them, that

6 these two products are not sold out of the same retail

7 outlet, for example, or sold on the same website but on

8 different websites and out of different facilities?

9 　　　　　MR. FRIEDEN:  Your Honor, similar facilities,

10 I think what that means, Your Honor --

11 　　　　　THE COURT:  I understand.  Would the Court be

12 able to consider those facts?

13 　　　　　MR. FRIEDEN:  No, Your Honor.  I think the

14 Court has to take as established that they sell --

15 because the issue of similar facilities is how and to

16 whom the respective goods of the parties are sold.  The

17 key question there is whether both products are sold in

18 the same channels of trade.  That has been established,

19 Your Honor.

20 　　　　　THE COURT:  What does that mean?  That's what

21 I'm asking.  What factually does that mean in order for

22 the Court to attach weight to that factor?

23 　　　　　MR. FRIEDEN:  I think it has to be strongly

24 weighed, Your Honor, in our favor.  Because to do

25 otherwise, Your Honor, puts us in the same position we

1   were in before Judge Jones.

2          The reason that Judge Jones deemed it in our

3   favor, Your Honor, is because we didn't have the

4   ability to get to the underlying facts so that we could

5   prove it.

6          So to the extent that the Court looks behind

7   the deeming, to look at the fact that they now -- what

8   they've done is limited the facts.  They have said --

9   the only overlap in sales is on the Internet.  They

10  sell in their own salons.  We don't.  Well, the fact is

11  is what we found in discovery is they do sell in

12  salons.

13         THE COURT:  But not yours.

14         MR. FRIEDEN:  Not ours, but different salons.

15  But the fact is that we were not able to fully flesh

16  that out because the distributors and brokers they were

17  supposed to identify for us, by the close of discovery,

18  out of 15 to 40, they had only identified 7.

19         THE COURT:  How many?

20         MR. FRIEDEN:  It was 7 out of -- they say 40.

21  We think it was at least 15 that we identified after

22  the discovery period.

23         So for the Court to go behind --

24         THE COURT:  So about half?  You got

25  information on about half of them?

1          MR. FRIEDEN:  We got the identify of less

2     than half if it's only 15.  In 30(b)(6) deposition,

3     they said it was as many as 40.  Quite frankly, Your

4     Honor, I don't know.

5          But if the Court goes behind those, we're

6     placed in the same position, which we've been

7     disadvantaged by the fact that -- and this is not a

8     situation -- and I know that the Court knows Judge

9     Jones in this court.  This is not a situation where a

10    single motion to compel was filed and they were ordered

11    to produce the information.  We filed four discovery

12    motions.

13         It wasn't a situation where the magistrate

14    judge found that they had failed to comply with

15    discovery.  The magistrate judge indicated in the

16    transcript of that hearing that he was making a finding

17    that they had objected discovery.

18         So to look behind the facts and to give

19    weight to their ability to sort of constrain the facts

20    to what they want the Court to see places us in the

21    same prejudicial position as we would have been in had

22    the court not deemed that admitted -- or deemed that

23    established.

24         So I believe that the Court has to take that

25    deeming as established and give it strong weight.

 1    Because to do otherwise would essentially eviscerate

 2    the magistrate judge's order and place us, quite

 3    frankly, at an even greater disadvantage, Your Honor,

 4    because we are not in a position to have all the

 5    information to prove that we do sell in salons -- that

 6    both parties sell their products in salons and they

 7    sell, in many instances, salons that are right near

 8    each other.

 9                THE COURT:  All right.  Thank you.  Let me

10    hear from the defendants.

11                MR. MILLER:  Good morning, Your Honor.

12                THE COURT:  Now, as I understand it, you

13    think their motion should be denied because there are

14    factual disputes that would need to be resolved in

15    order for them to prevail.

16                MR. MILLER:  I think that's clear, Your

17    Honor.

18                THE COURT:  But you don't think there are any

19    factual disputes that would prevent you from

20    prevailing?

21                MR. MILLER:  No.  I think the issue, as just

22    simply stated, is there sufficient evidence to go to

23    trial on likelihood of confusion?  If there is, it's

24    going to require a trial.  If not a possibility of

25    confusion but a likelihood, then summary judgment is

1  appropriate.  So the only issue, I think, before Your

2  Honor today is should the matter go to trial or not,

3  not whether summary judgment should be granted for

4  plaintiff.

5          THE COURT:  While we're talking about this,

6  what's your take on the scope of Judge Jones' ruling on

7  similarity of facilities?

8          MR. MILLER:  As I understand it -- well, we

9  sell through distributors.  The plaintiffs tried to

10 subpoena our distributors.  We're out there trying to

11 get them to comply.  They're not us.  We don't control

12 them.

13         THE COURT:  Then the distributors, in turn,

14 distribute to other retail facilities?

15         MR. MILLER:  Right.  And I think they were

16 looking at geographic scope.  They were also looking at

17 whether or not some of our distributors or distributors

18 of distributors sell to salons.  In the short time

19 period, we couldn't get all the distributors to comply.

20 They are not under contract to us.  It's just what it

21 is.  Magistrate Jones ruled that the facilities issue

22 is presumed.

23         Counsel mentions it shouldn't put them in a

24 worse position than before.  I agree with that, but it

25 certainly shouldn't put them in a position that they

1 weren't before or admit facts that clearly are

2 undisputed.

3          For example, clearly, we're not using the

4 same retail store.  They sell physically through their

5 own salons.  That's where they sell them.  They control

6 what products are in their salons.  I highly doubt

7 they're going to let our products go in their salons

8 even through a distributor.  I don't think the

9 magistrate wanted to ignore that undisputed fact.

10          I think the scope of that ruling, Your Honor,

11 is that geographically you can consider the fact we're

12 in all 50 states.  Some of our distributors or

13 distributors of distributors may sell to salons.

14 That's the extent of it.

15          To rule that we're on the same facility would

16 go -- would create a fiction and run against what the

17 plaintiffs themselves say.  It wouldn't make any sense.

18 Clearly, we're not in their salon.

19          THE COURT:  Are there transcripts of Judge

20 Jones' rulings?

21          MR. MILLER:  I don't know.

22          MR. FRIEDEN:  There are, Your Honor.  We can

23 get a copy.

24          THE COURT:  Well, they should be filed if

25 they --

1              MR. FRIEDEN:  We'll make sure they are filed.

2              THE COURT:  All right.

3              MR. MILLER:  I think the way to interpret

4    Judge Jones' ruling is inconsistent with what's

5    undisputed in this case.

6              THE COURT:  All right.

7              MR. MILLER:  That is to bind us to a

8    geographic scope of the nation and distributors of

9    distributors may sell to salons, not theirs.

10             THE COURT:  All right.  What's your response

11   to their position that you've conceded likelihood of

12   confusion as to lotions in related litigation?

13             MR. MILLER:  Highly disputed.  We don't

14   concede that in any way, shape, or form.

15             Again, a little background, Your Honor.  We

16   basically -- we registered the first mark in 2005,

17   started use in 2005, not later.

18             THE COURT:  2005?

19             MR. MILLER:  2005.

20             THE COURT:  You got your registration in

21   2007?

22             MR. MILLER:  I believe so.

23             THE COURT:  Okay.

24             MR. MILLER:  The first use goes back to '05.

25   These products have been in the marketplace competing

1 eight years, not six, eight.

2          THE COURT:  Well, they weren't competing

3 until recently, correct?

4          MR. MILLER:  It was 2010, I believe, that the

5 plaintiff started their lotion or at least made

6 application for it.  It's a very small portion, I

7 understand, of their line.  If you get on their

8 website, you actually have to search for it.  You can't

9 just find it.  But it is now a part of their product

10 line or lotions.  We've been doing that earlier.  We

11 were actually the first use for lotions in the first

12 application.

13          They had the mark earlier for hair care

14 products.  Your Honor, let me make it clear:  We're not

15 in hair care.  I'll make a representation to the Court

16 today:  We have no intent on using the SIBU mark in

17 hair care, period.  It won't happen.

18          We're dealing with simply the issue of

19 lotions and hair care products.

20          THE COURT:  Are all of your client's products

21 derived from the sea buckthorn seed?

22          MR. MILLER:  Every single one of them.

23 That's all we do.  We are the sea buckthorn company.

24 It's a little orange berry from the Himalayans, and

25 that's what we do.  We sell products that contain that.

1  Counsel says --

2        THE COURT:  Are there other commercial

3  products that are built around that berry?

4        MR. MILLER:  Yes.  In fact, we sell a number

5  of them.  Counsel says we're primarily lotions.  No, it

6  is not, and we have never conceded it's not.  Lotions

7  are just one thing we do.  It's largely a nutraceutical

8  company.  It's health.  We cater to those who are

9  interested in the benefits of ingesting and using

10  beverages and products that contain sea buckthorn.

11  It's a health food marketplace.  That's what we do.

12        THE COURT:  You have drinks?

13        MR. MILLER:  Yes, juices, beverages,

14  capsules.

15        THE COURT:  It uses the SIBU name as well?

16        MR. MILLER:  Every single one.  They all use

17  SIBU, and they all have the sea buckthorn berry.

18  That's what we do.

19        We do not concede at all that there's a

20  likelihood of confusion.  At a period of time when this

21  first got started in 2010, there were some pleadings

22  made before the trademark board.  It's not relative

23  now.  In fact, we even filed a counterclaim here in

24  this case.  We then looked to see if there's a

25  likelihood of confusion.  The products have been in the

1   marketplace since then.  We found zero, zilch, none,

2   nothing, and asked for our counterclaim to be

3   dismissed.  We can't show likelihood of confusion.  We

4   don't believe it exists.  We've never conceded that.

5   In fact, in paragraph --

6           THE COURT:  What were the statements in the

7   litigation that the plaintiff is relying on?

8           MR. MILLER:  Well, the answers to

9   interrogatories.  I think it's number nine of the first

10  set.

11          By the way, they quoted wrong.  We indicate

12  that plaintiffs believe there was -- we admit that

13  plaintiffs believe there's a likelihood of confusion,

14  not SIBU.  There are statements in the trademark board,

15  though, about that.

16          In our counterclaim, we do say SIBU.  It was

17  a typographical error, but it's dismissed.  We withdrew

18  that counterclaim with the court's permission.  It's

19  gone.  It's over.  We don't believe there is any

20  likelihood of confusion whatsoever.

21          THE COURT:  All right.

22          MR. MILLER:  I don't even know what -- and

23  this idea of concession, I don't know what legal theory

24  it would be based on.  Judicial estoppel?  The Fourth

25  Circuit, like the circuit I practice in --

1            THE COURT:  Or judicial admission.

2            MR. MILLER:  -- requires -- at least it

3   requires some sort of act that the court takes with

4   respect to that.  There was none.  It's like an

5   alternative pleading which got dismissed.  We

6   couldn't --

7            THE COURT:  These admissions that they

8   allege, they occurred in the Utah litigation; is that

9   right?

10           MR. MILLER:  Yes.

11           THE COURT:  These were in pleadings filed in

12   the Utah litigation in federal district court?

13           MR. SCHIFFRIN:  Yes.  They were very

14   preliminary.  They disputed jurisdiction.  It got

15   kicked out for jurisdiction.  They're done.

16           THE COURT:  All right.

17           MR. MILLER:  There was no action taken on

18   this whatsoever.

19           THE COURT:  I understand.

20           MR. MILLER:  That was very early on in 2010.

21   We've now got a history of this where it's clearly

22   established there is no likelihood of confusion between

23   these products or the branding, and that, we believe,

24   is the stronger case by far.  Your Honor, if there

25   were -- they argue we concede issues and that there

1    should be summary judgment on related goods.  The issue

2    of whether or not it's a related good is itself a

3    question of fact.

4            We've submitted testimony that we believe

5    these health extract products are not related.  You can

6    look at a general -- the Ed Gully declaration.  You can

7    look at general categories.  There is a general omnibus

8    category called beauty.  There's a subcategory between

9    the two, and there's even a sub-subcategory between

10   health and prestige.

11           What the plaintiffs are is they sell prestige

12   products through their salons.  We sell health care

13   products to those who are interested in ingesting and

14   using sea buckthorn.  They're not related products, and

15   we believe evidence will be required to the Court to

16   show that.  It's certainly not one for summary

17   judgment.

18           THE COURT:  Your client is a private company?

19           MR. MILLER:  Yes.  Yes.

20           We acknowledge, Your Honor, that on the

21   plaintiff's side what they have is their case is

22   basically that these marks are phonetically similar.

23   They argue they're both advertised on the Internet and

24   that some of those advertisements use females, about

25   51 percent of our population.

1           On the other hand -- by the way, Your Honor

2  asked about weight to be given to phonetics.  It

3  depends on how the consumers perceive it.  On the

4  Internet with exception of videos, it's all in print.

5  It's the visual representation of those marks that

6  control, and those are not similar.  Your Honor can see

7  those and look for yourself, but they are not similar

8  looking marks in font or style.  It's a pronunciation

9  issue and a pronunciation issue only.

10          On the other hand, we know what these marks

11  have actually done in the last eight years.  We have

12  history.  There's no appreciable actual confusion.  The

13  most single important factor in these cases is history

14  and actual confusion.  There is none.

15          They're sold to different consumers.  They

16  are different products.  The products do not and will

17  not appear for sale in the same physical location,

18  their salons.  It won't happen unless they make it so.

19  The other factors, we believe, don't support likelihood

20  of confusion.  It's just phonetics.

21          Let me address actual confusion, which is

22  really the most important, very briefly, Your Honor.

23  All we have -- for example, before the action was

24  filed, there is one e-mail, one, a misdirected e-mail.

25  It clearly wasn't evidence of a confusion of product.

1    They're asking for shampoos and conditioners.  We don't

2    make them.  We don't have a shampoo or a conditioner

3    for which they could be confused over.  Clearly, it was

4    just a misdirected e-mail.

5         The case law here in this court, *Worsham* or

6    in the *Duluth* case out of the other circuit make it

7    clear that that's not enough.  In fact, we have less

8    here, substantially less here than the court found in

9    *Worsham* did not rise to the level of actual confusion.

10        THE COURT:  So what you're saying is even if

11   there were actual confusion, it's not going to result

12   in any harm because they couldn't buy a substitute

13   product from you?

14        MR. MILLER:  Well, there's no confusion as to

15   their product as ours.  We don't have the product.

16        THE COURT:  Since you don't have health care

17   products, if they came to you and they say, We want

18   shampoo, you'd say, Well, wrong SIBU.

19        MR. MILLER:  Wrong SIBU, yeah.  There's no

20   harm.  Both parties have profited.  They've all grown.

21   They've sold millions of dollars worth of product, and

22   there is not a shred of evidence indicating either one

23   have tread on each other and hurt each other in this

24   market, not a single shred.

25        Since the lawsuit was filed, among the

1  thousands of e-mails produced, another e-mail was

2  found.  Again, just one.  It was not from a consumer.

3  It was from a blogger who was soliciting content for

4  her blog, again, just confusion over the company name.

5         THE COURT:  So there's no overlap in product

6  lines other than this more recent lotions product line?

7         MR. MILLER:  That's right.

8         Primarily, we're health.  That's juices.

9  That's capsules.  I'm not aware of any evidence that

10  when people see our capsules, they get confused and

11  think should I put this on my hair.  They're to be

12  ingested.  If there's any benefits to the hair, as

13  plaintiffs have alleged, it's simply because the health

14  benefits of ingesting the sea buckthorn help your

15  nails, help your skin, help your eyes.  It is no more

16  likely to confusion with someone who provides

17  eyeglasses.

18         THE COURT:  How many different lotion

19  products do you market?

20         MR. MILLER:  May I inquire?

21         THE COURT:  Yes.

22         MR. MILLER:  Eight or nine.

23         THE COURT:  All right.

24         MR. MILLER:  The majority -- it's not

25  primarily.  The majority of the stuff is in these other

1   products that --

2           THE COURT:   Out of a total product line of

3   how many items?

4           MR. MILLER:   Twenty-two.

5           THE COURT:   All right.

6           MR. MILLER:   The products just themselves are

7   different, Your Honor.   Again, premier salon type

8   products.   These are products that people go into hair

9   salons to have an upscale experience.   They can have

10  their salon person -- I'm sorry.   I don't go to them.

11          THE COURT:   You're talking about your

12  products or their products?

13          MR. MILLER:   Plaintiff's.

14          They can go to the salons, have their hair

15  stylist -- I guess would be the term -- use these

16  products.   They can also purchase them there.   It's the

17  only physical place they can.   It is to be contrasted

18  by the health food area where we only make sea

19  buckthorn products.

20          As Mr. Gully pointed out in his declaration,

21  it's a very separate subcategory and a separate

22  sub-subcategory.   It's juices, capsules, extracts, and

23  lotions.   There's no evidence the consumers are going

24  to be confused between these capsules and the

25  hairstyling.

1             And the consumers themselves are different.

2    Their consumers are looking for the hairstyle.  Our

3    consumers are the health food, the whole food market,

4    the MOM's health food market here in this area.

5             Both parties are providing what we call

6    specialty products to very discerning customers.

7    Although they use their own employees as purported

8    experts to say the skin care and hair care are often

9    found in the same -- and that may be true if you're

10   talking about Wal-Mart or Target.  It's not true when

11   you're talking about specialty type products like

12   they're offering.

13            The case law is clear that consumers of

14   specialty products typically select those products

15   because the uniqueness of the products.  They go and

16   buy the plaintiff's hair products because they've used

17   them at their salons.  They want to duplicate that at

18   home.  Those consumers are sophisticated.  They know

19   what they're looking for.

20            The consumers that use the defendant's

21   products use it because the sea buckthorn extract, and

22   they're looking for the health qualities given by that

23   product.  They're not confused by whether or not the

24   sea buckthorn product is an upscale hair salon product.

25   These consumers know different, and that's why you

1  don't see any evidence of actual confusion.

2            Let me address briefly some comments made

3  about the strength of the market.  Yes, we do concede

4  that in the hair care products, the plaintiff's mark

5  has been incontestable over five years, yes, as to hair

6  care products.  We were the first ones to use lotions,

7  and we were the first ones to register it.

8            So the issue then, in part, is does this

9  related doctrine product apply sufficiently to excuse

10 them?  Obviously, the plaintiff didn't think so.  It

11 went and filed a second registration for lotions

12 thinking it needed that coverage.  So plaintiff thought

13 it needed to.  We believe they needed to.  It's

14 certainly not conceded.  If Your Honor feels this needs

15 to go to trial, that will be a disputed issue of fact.

16           Similarity of advertising, there really isn't

17 any overlap.  The defendant advertises in targeted

18 health magazines.  The plaintiff does not.  The

19 plaintiff did not purchase outside advertising such as

20 that.  They rely on salon and unsolicited media

21 coverage.

22           There is one commonality, the Internet.  I'm

23 not aware that the plaintiff purchases Internet but

24 does self-promote through social media generally free,

25 Twitter, YouTube, stuff like that as does every other

1  single major company in the country.  If using the

2  Internet made it so that there is a commonality in

3  advertising, that element now in this day and age is

4  totally meaningless because everyone uses it.  It is so

5  ubiquitous that it's lost its meaning if the Internet

6  itself is the way in which commonality is to refer to.

7          That same problem of ubiquitousness is looked

8  for with respect to the defendant's intent.  Plaintiff

9  argues, well, you can infer intent circumstantially

10  because we refuse to give up our mark.  In a case where

11  you refuse to give up your mark and we go to court, you

12  can presume that we've used the mark in light of their

13  allegations and we have bad intent.  Again, that makes

14  that factor totally 100 percent irrelevant because

15  guess what?  In every case that's what happens.

16          The fact you don't honor a cease and desist

17  letter should not by itself find intent.

18          The idea of spoliation, Your Honor, I don't

19  even know how to seriously deal with that issue.  I am

20  unaware of any finding of spoliation.  I am unaware of

21  case or event that we have done.  I am unaware of

22  anything here that would even rise to that level.  We

23  were unable to get our distributors to give the

24  information plaintiffs felt they were justly entitled

25  to.  Third parties, that's what happened.

1          The suggestion by plaintiff's counsel that we

2  have hidden evidence or failed to give evidence,

3  therefore, justifying an intent not only assumes facts

4  not in evidence, but I find personally insulting.  It

5  is not what happened in this case.

6          Your Honor, in a nutshell, the plaintiff's

7  case starts with and ends with the phonetic similarity.

8  I admit that at first blush that got my attention.

9  Then you look at the history in the marketplace.  You

10  look at the other factors, and there's simply no

11  evidence to justify going forward.  It makes sense.

12  These are different products targeted to different

13  consumers, marketed differently.  They will never

14  appear in the same facility.  They are different

15  graphics.  There's only the sound, and in light of no

16  evidence of actual confusion in the marketplace,

17  phonetic similarity is just not enough.

18          THE COURT:  All right.  Thank you.

19          Counsel, I'll give you the last word on this.

20          MR. FRIEDEN:  Your Honor, with respect to the

21  transcript in which Judge Jones found that they

22  obstructed discovery, that has been filed.  It's

23  Document Number 120-2.  I believe -- that was filed in

24  support of our reply and in support of our motion for

25  partial summary judgment.

1             THE COURT:  Thank you.

2             MR. FRIEDEN:  That's Judge Jones' ruling with

3    respect to the third motion to compel immediately

4    before the fourth motion, which is where he deemed the

5    establishment.  We will find the transcript for the

6    fourth and make sure that's filed as well.

7             THE COURT:  All right.  How important is it

8    to your position the overlap on the lotions?  That's

9    the only overlap in terms of the actual products; is

10   that right?

11            MR. FRIEDEN:  That's the only overlap in

12   terms of actual specific products.  How important is

13   that?  I think it's important in a number of ways, Your

14   Honor, because it shows that even with respect to hair

15   care and skin care, there's a relationship because both

16   parties have moved to the middle.  And now they say

17   they're not going to move into hair care, but in 2009,

18   they don't dispute that they had intended to move into

19   hair care.  So it's important because it shows, one,

20   where the harm is going to come from, but it's

21   important also to show the relatedness between the skin

22   care and the hair care lines, Judge.

23            THE COURT:  All right.  But your position is

24   not so much that there's confusion as to specific

25   products, but there's confusion as to origin?

1         MR. FRIEDEN:  Yes, Your Honor.

2         THE COURT:  All right.

3         MR. FRIEDEN:  With respect to the benefits

4 that they champion in terms of all of their SIBU

5 branded products, it is the sea buckthorn berry, Your

6 Honor.  They highly promote the benefits of that

7 product to hair.  And in that instance, Your Honor --

8         THE COURT:  Say that again.

9         MR. FRIEDEN:  They spent a lot of time

10 promoting the benefits of SIBU, LLC, promoting the

11 benefits the sea buckthorn berry has to hair.  So it's

12 not a great leap for a consumer to believe that they

13 might have hair care products as well.

14         The issue is not, Your Honor -- in terms of

15 trademark infringement, the issue is not that a

16 customer is going to go to them looking for CIBU

17 branded products and go away because they don't have

18 the opportunity to buy hair care from them.  The issue

19 is that they will go to them believing that it's

20 sponsored by us and purchase one of their products

21 because they believe it to be associated with us as the

22 originator.

23         They suggest that we have mischaracterized

24 their concessions with respect to the confusingly

25 similar nature of the marks, and that's just not true.

1   In Document Number 12 in this case, Your Honor, at

2   page 12, paragraphs 19 through 21 and 24, which was

3   their counterclaim which was dismissed -- however, that

4   document contains the following statement:

5           Quote, SIBU admits that SIBU and CIBU marks

6   are confusingly similar when used to sell body creams

7   and lotions, period, end quote.

8           That's an admission, Your Honor, and the fact

9   that their counterclaim was withdrawn voluntarily makes

10  it nothing other than an admission.

11          In their opposition to Bubble's trademark

12  application Serial Number 85/111316, which is the

13  second registration request for the SIBU mark for skin

14  care products and a number of other things, they state

15  quote, The similarity in sound and appearance between

16  SIBU and CIBU marks creates a likelihood of confusion

17  if the marks are used in the sale of the same or

18  substantially similar products, period, end quote.

19          They suggest that it would only be a judicial

20  admission if an action had been taken, but the fact is,

21  Your Honor, these representations were made in 2011 and

22  2012.  They have not withdrawn their objection to our

23  CIBU registration for skin care.  As a result, we don't

24  have the registration.  So an action has been taken by

25  the USPTO on the basis of this representation, and we

1   are in a holding pattern because of that.  They have

2   not undone it.  What they would like to do, Your Honor,

3   is maintain that representation there and make a

4   different representation here.

5          With respect to the argument that there's no

6   appreciable actual confusion, they concede that a large

7   number of their products are sold through distributors,

8   which they claim to have no control over.  They suggest

9   that it wasn't a concealing of information, that they

10  didn't have the ability to control third parties.  I

11  would suggest to you that Judge Jones found that to not

12  be the case, and the transcripts will make that clear.

13         The fact is, Your Honor, they didn't even

14  provide the information within their control.  Had they

15  identified back in August, which is when we filed our

16  first motion to compel on these issues, the identity of

17  the distributors and brokers, we would have subpoenaed

18  them at that time and gotten the information.  And I

19  might've had a complaint that they didn't provide me

20  the information pursuant to another discovery request,

21  but it's never a complaint I would have raised to this

22  Court because I would've had the information I needed.

23         The fact is, Your Honor, at the close of

24  discovery, despite the fact that they admit to having

25  at least 15 to 40 of those brokers/distributors, they

1   had identified precisely 7.  We didn't have the

2   opportunity to obtain the information directly from

3   those third parties.  We didn't have that opportunity

4   because based on Judge Jones' decision, they obstructed

5   discovery.  That's not me saying it.  It's Judge Jones

6   saying it.  They didn't object to that order or to that

7   finding; therefore, it's established.  They can't even

8   appeal it when the case goes to the Fourth Circuit.

9           So the fact is, Your Honor, the lack -- if

10  there is a lack of evidence of actual confusion, it's

11  based in large part upon their conduct.  As the Court

12  well knows, the measure of actual confusion is not

13  absolute.  The Court views actual confusion vis-a-vis

14  what the Court would expect to see in terms of evidence

15  of actual confusion.

16          And in instances where the products are

17  fairly inexpensive and are impulse buys, like hair care

18  products, courts have found that you don't need much

19  actual confusion to establish this factor.  In this

20  instance, Your Honor, we have a unique situation where

21  the difficulty in bringing to light evidence of actual

22  confusion is directly related to the bad conduct as

23  found by the magistrate judge of the defendant in this

24  case.

25          Had the defendant not acted in the way it

1    did, there might have been much more evidence of actual

2    confusion.  But they cannot complain --

3              THE COURT:  How would it be precluded in

4    finding actual confusion evidence?

5              MR. FRIEDEN:  When you sell through a

6    distributor, Your Honor, a consumer that's confused by

7    the nature of the product or the consumer that's likely

8    to contact you about a product is likely to contact the

9    people they buy the product from, the brokers and

10   distributors.  They're less likely to go to directly to

11   SIBU, LLC.  So sending discover to them may not get the

12   actual confusion evidence that the retailers, the

13   distributors, and the brokers have.

14             THE COURT:  You knew of some of the

15   distributors?

16             MR. FRIEDEN:  Yes, and we subpoenaed them.

17             THE COURT:  Did you depose them?

18             MR. FRIEDEN:  We did not depose them.  We

19   didn't find them -- it was towards the end of the

20   discovery period, Your Honor.  After the third motion

21   to compel, we finally got all of that information.  We

22   subpoenaed those distributors.  We found some

23   information which was helpful, and we worked through --

24   we investigated that --

25             THE COURT:  Information as to actual

1    confusion?

2            MR. FRIEDEN:   -- information that we thought

3    might indicate it.  It didn't indicate it.  I know -- a

4    little bit about the background, Your Honor.   In

5    calling down the evidence we were going to present, we

6    wanted to make sure the evidence was clear.  It was not

7    as clear as we would like.

8            THE COURT:  All right.

9            MR. FRIEDEN:  The fact is, Your Honor, we

10   only knew about seven of them before the discovery

11   period.  Some of those weren't identified in time even

12   for us to subpoena.  Then the other eight or however

13   many weren't identified until after the discovery

14   period -- the fact is that those are the individuals

15   and companies most likely to have the actual confusion

16   evidence.

17           The fact is, Your Honor, that there's a

18   period of several years.  There's four instances of

19   actual confusion that we could prove even under these

20   circumstances in addition to the survey evidence.

21           THE COURT:  Let's assume it were conceded

22   there was a likelihood of confusion as between the two

23   marks as it applies to lotions.

24           MR. FRIEDEN:  Yes, Your Honor.

25           THE COURT:  As I understand your position,

1  that carries over to the broader issue of whether

2  there's likelihood of confusion as to the marks

3  generally because your mark is uncontestable and it

4  would trump basically their junior mark; is that right?

5           MR. FRIEDEN:  Yes.

6           THE COURT:  Even as to lotions?

7           MR. FRIEDEN:  Yes, Your Honor.

8           THE COURT:  All right.

9           MR. FRIEDEN:  Really, that has to do with

10  whether the goods are related.

11           THE COURT:  Because the goods are related?

12           MR. FRIEDEN:  Yes, Your Honor.

13           THE COURT:  All right.

14           MR. FRIEDEN:  One last point, Your Honor.

15  They mention that the Internet is ubiquitous in terms

16  of its use for marketing and advertising, which is

17  true.  Their view that just because two parties use the

18  Internet doesn't mean that they share advertising

19  channels is also true, but this isn't the case we have

20  here.  Perhaps they have a bit of an outdated view of

21  what the Internet is like.  In this instance, it's not

22  just that both parties have Web storefronts.  They have

23  websites.  They also use precisely the same social

24  media sites, Twitter, Facebook, and YouTube.  They're

25  both heavy users of YouTube.

1          This is the best analogy I can think of.  If

2    I were to come in and say, We have similar advertising

3    because we both advertise on cable television, the

4    argument might be made, well, that's really ubiquitous.

5    A lot of companies advertise on cable television.  But

6    that's not what we're saying.  What we're saying is

7    much more akin to we both advertise on cable television

8    on the exact same networks.  We both advertise on

9    Discovery, on the science channel, and on CNN.  That is

10   a similarity in advertising media, and it should be

11   considered to support a finding of likelihood of

12   confusion in this case.

13          Your Honor, I would suggest -- we have a

14   trial date coming up in ten days.  We believe that

15   summary judgment is appropriate in our favor.  If not,

16   we believe that it's certainly appropriate for the

17   Court to establish certain facts contained in the

18   motions as being established for the purposes of any

19   hearing that would be later needed.

20          THE COURT:  All right.  Thank you.

21          MR. MILLER:  May I?

22          THE COURT:  Go ahead.

23          MR. MILLER:  I just want to clarify one fact

24   that Mr. Frieden brought up.  He had mentioned that

25   there has been a determination by the Patent and

1  Trademark Office with regard to their second

2  application.  That's not a determination.  The

3  application is actually suspended based on the Utah

4  proceeding and then this proceeding.  Prior counsel for

5  defendant had actually asked that it be removed from

6  suspension.  They wanted to keep it on suspension.  So

7  the reason the board hasn't acted, essentially, is

8  based on simple suspension and the fact that the board

9  will every six months inquire as to whether there's

10 been any progress in the district court case.  Since

11 we've had a district court case for a while now,

12 there's been no reason to remove it, but it has not

13 made any determination one way or the other.

14            THE COURT:  All right.

15            MR. MILLER:  Your Honor, may I real quickly

16 respond to one thing?

17            THE COURT:  Go ahead.

18            MR. MILLER:  Counsel asked that if they're

19 not granted summary judgment, that they get undisputed

20 issues of fact applied to trial.  I think that's

21 improper, Your Honor.  Rule 56 makes it very clear that

22 undisputed facts are for the purposes of the motion

23 only.  There's case law I'm very familiar with -- I

24 can't cite now because this was just raised -- to

25 indicate that a trial -- if summary judgment is not

1    granted, the parties are free to produce whatever

2    evidence they choose on those facts.  That would be

3    what we intend on doing.

4              THE COURT:  All right.  The Court wishes it

5    could resolve this on summary judgment, but I don't

6    think it's in a position to do that consistent with the

7    standards that apply to summary judgment, which would

8    require, in order to enter summary judgment, that even

9    when viewing the facts most favorably to the nonmoving

10   party, there's no genuine issue of material fact and

11   one party is entitled to judgment as a matter of law.

12             As I think counsel for both parties

13   recognize, it's fairly fact intensive, and it's going

14   to require this Court to assign weight to various

15   factors and to assess an overall balance between those

16   factors with respect to their ultimate issue of whether

17   there is likelihood of confusion as between these two

18   marks.

19             So the Court is going to deny both motions

20   for summary judgment.

21             There is a motion to strike alleged facts in

22   evidence supporting the defendant's motion for summary

23   judgment.  The Court would reach the same decision with

24   respect to summary judgment irrespective of whether or

25   not those facts were considered.  So the Court is going

1   to deny that motion as moot.

2            With respect to the in limine motion to

3   exclude testimony, the Court is going to defer that

4   until the trial.

5            So we'll proceed to trial on the 13th.

6            I understand that both parties have raised

7   various objections to exhibits for everything from

8   authenticity to other issues.  It strikes the Court

9   that a lot of the evidence can be presented in a fairly

10  summary fashion.  It's really going to get down to

11  arguing what the evidence means.  So I would ask both

12  sides to really make a genuine effort to really try to

13  agree on what can be stipulated to in terms of the

14  evidence and really limit what live testimony we're

15  going to need to present beginning on the 13th.

16           All right.

17           MR. MILLER:  Your Honor, may I ask for a

18  little bit of clarification on some of the deadlines?

19           THE COURT:  Yes.

20           MR. MILLER:  I think we have a prior order

21  that states that the witness list and trial exhibit

22  list would be due after your ruling on summary

23  judgment.  So that would be Monday.

24           Then also, just because the trial is on the

25  13th and I need five business days to provide the

1  binders as well, that would also be on Monday.

2           So just to be clear, the witness list and the

3  binder that would be submitted to opposing counsel and

4  to the clerk's office would both be on Monday?

5           THE COURT:  I could extend that a couple of

6  days if you all --

7           MR. FRIEDEN:  Your Honor, if I may?

8           THE COURT:  Yes.

9           MR. FRIEDEN:  Taking to heart what the Court

10 has suggested, I believe that we'll be able to do that.

11 Perhaps it makes sense to move back that deadline

12 because if counsel on Monday can arrange to talk by

13 phone and go over the evidence that they intend to

14 submit in summary fashion --

15          THE COURT:  Why don't I extend it to close of

16 business on Wednesday?

17          MR. FRIEDEN:  I think that's perfectly

18 appropriate, Your Honor.  Would the Court wish us to

19 present objections in writing or just raise them at

20 trial?  Say objections by Friday?

21          THE COURT:  That would be fine.  To the

22 extent there are any genuine objections, I'd like to

23 have some short briefing on that.  So that can be

24 submitted by Friday.

25          MR. FRIEDEN:  Thank you, Your Honor.

1           THE COURT:  All right.

2           MR. MILLER:  Just to be clear then, so the

3  deadline is moved back for the lists and the exhibits

4  to Wednesday?

5           THE COURT:  Correct.

6           Okay.  Anything else?

7       (No response.)

8           THE COURT:  All right.  I take it the case is

9  unable to be resolved.

10          MR. FRIEDEN:  We met with Judge Jones.  We

11  thought we were close.  It did not materialize.  I'm

12  certainly happy to speak with counsel as we walk out

13  today.

14          THE COURT:  I would urge you to continue your

15  efforts if you can.  Otherwise, I will see you on

16  Monday, the 13th.

17          MR. FRIEDEN:  Yes, Your Honor.  Thank you,

18  Your Honor.

19          MR. SCHIFFRIN:  Thank you.

20          MR. MILLER:  Thank you.

21          THE COURT:  The Court will stand in recess.

22          ------------------------------------
                   Time:  11:43 a.m.
23
        I certify that the foregoing is a true and
24   accurate transcription of my stenographic notes.
                                   /s/
25                      Rhonda F. Montgomery, CCR, RPR